**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**


**Woodbridge Englewood, Inc.,**

*Plaintiff,*

**v.**                                                                          **Case No. 3:24-cv-056
Judge Thomas M. Rose**

**Angstrom Fiber Englewood, LLC,**

*Defendant.*

---

**ENTRY AND ORDER DENYING MOTION TO REMAND TO
STATE   COURT   BY   PLAINTIFF   WOODBRIDGE
ENGLEWOOD, INC., DOC. 9, AND GRANTING MOTION
TO  TRANSFER  BY  DEFENDANT  ANGSTROM  FIBER
ENGLEWOOD.  DOC.  15.  CLERK  IS  ORDERED  TO
TRANSFER  THE  INSTANT  CASE  TO  THE  UNITED
STATES  DISTRICT  COURT  FOR  THE  DISTRICT  OF
DELAWARE.**

---

    This matter is before the Court on Plaintiff Woodbridge Englewood, Inc.'s ("Woodbridge")

Motion to Remand (Doc. 9) and Defendant Angstrom Fiber Englewood, LLC's ("Angstrom")

Motion to Transfer (Doc. 15). The Court has reviewed the motions, the parties' supporting

memoranda, and all applicable law. Because the parties are diverse and the minimum amount in

controversy for diversity jurisdiction is met, Woodbridge's Motion to Remand (Doc. 9) will be

1

**DENIED**; because the factors governing motions to transfer favor transfer, Angstrom's Motion to Transfer (Doc. 15) will be **GRANTED**.

## I.    Background

Woodbridge is an Ohio corporation and subtenant of real property located at 300 Lau Parkway in Clayton, Ohio (the "Premises"). (Doc. 1-2, PageID 10.) On June 29, 2023, Woodbridge and Angstrom entered into a commercial sub-sublease agreement for the Premises (the "Lease") whereby Woodbridge subleased the Premises to Angstrom for six months for $60,000 a month. (Doc. 1-2, PageID 23.) Angstrom had the option to purchase the Premises from its owner during those six months but did not do so. (Doc. 7-2, PageID 119.) The Lease was for an initial six-month term that could be extended through May 15, 2032. (Doc. 7-2, ¶ 3, PageID 155 and 7-3, ¶ 5, PageID 169.)

Woodbridge alleges that the Lease expired December 29, 2023, and Angstrom has refused to vacate and surrender the Premises to Woodbridge. (Doc. 1-2, ¶ 3, PageID 11, ¶¶ 5-7.) On February 1, 2024, Woodbridge allegedly served Angstrom with a three-day notice to vacate the Premises pursuant to Ohio Revised Code § 1923.04. (*Id*.) Angstrom allegedly remains in possession of the Premises. (*Id*. ¶ 8.) Angstrom allegedly has not paid rent since the expiration of the Lease. (*Id*. ¶ 9.)

On February 13, 2024, Woodbridge filed a Complaint (Doc. 1-2) for forcible entry and detainer against Angstrom in the Vandalia Municipal Court, Civil Division. In its Complaint (Doc. 1-2), Woodbridge sought restitution and recovery of the Premises pursuant to Ohio Revised Code § 1923 *et seq.*, but did not allege or seek monetary damages. (*See* Doc. 1-2, PageID 11.) The Complaint seeks "restitution of the [Property] from this Court, restor[ation] of all of its rights,

possession and interest in the [Property];" "restitution and recovery of the [Property] and for all other relief, legal and equitable, which this Court deems proper." (*Id*.) Woodbridge further "expressly reserves all of its rights and remedies to collect monetary damages for [Angstrom]'s breach of the [Lease]." (*Id*.) Angstrom denies all of the Complaint's allegations. (Doc. 7.)

The Lease is predicated on an Asset Purchase Agreement executed on June 16, 2023 by the parties for the sale of the Property to Angstrom. (Doc. 1-2, PageID 13; Doc. 7-1.) Woodbridge and Angstrom further executed a "Letter Agreement" on the same day as the Lease. (Docs. 1-2 and 7-2.) The Letter Agreement is referenced in the Asset Purchase Agreement as well as in the Lease. (Doc. 7-2, PageID 118.) The Letter Agreement states that "in connection with the Asset Purchase Agreement, Woodbridge … intends to [execute the Lease] to [Angstrom] … on the terms and conditions set forth in the [Lease]. Woodbridge … and [Angstrom] intend that the [Lease] expire contemporaneous with the sale of the Property contemplated by this Letter Agreement." (*Id*.)

The Letter Agreement continues by specifying the process and requirements for the sale to proceed. (*Id*., PageID 118-124.) Paragraphs 20 and 21 of the Lease provide:

> 20. Purchase Agreement. Sublessor and Sublessee acknowledge and agree that the terms, covenants, agreements, conditions, representations, warranties, and indemnities contained in the Asset Purchase Agreement shall not be superseded, amended, enlarged or rescinded by this [Lease], but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Asset Purchase Agreement and the terms of this [Lease], the terms of the Asset Purchase Agreement shall control.

> 21. Entire Agreement. This [Lease] and the Purchase Agreement, together with the Letter Agreement, and [sic] constitute the entire agreement of the Parties and this [Lease] may be modified only in writing signed by The Parties….

3

(Doc. 1-2, PageID 19.) Thus, it appears to the Court that the Lease is not complete without the Asset Purchase Agreement and the Letter Agreement.

While the Lease lacks a forum selection clause, the Asset Purchase Agreement contains one. Specifically, Paragraph 10.6 of the Asset Purchase Agreement states:

> 10.6 Governing Law; Jurisdiction. This Agreement will be governed by and construed in accordance with the Laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction). ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY MAY BE INSTITUTED IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA OR THE COURTS OF THE STATE OF DELAWARE IN EACH CASE LOCATED IN NEW CASTLE COUNTY, DELAWARE, AND EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING. SERVICE OF PROCESS, SUMMONS, NOTICE OR OTHER DOCUMENT BY MAIL TO SUCH PARTY'S ADDRESS SET FORTH HEREIN SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY SUIT, ACTION OR OTHER PROCEEDING BROUGHT IN ANY SUCH COURT. THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(Doc. 7-1 at ¶ 10.6, PageID 74) (allcaps in original). The Asset Purchase Agreement defines "Transaction Documents" to include the Lease and the Letter Agreement. (Doc. 7-1, PageID 81.) Hence, the Asset Purchase Agreement plainly allows that all legal actions predicated on the Lease

"may" be brought in the state or federal courts of New Castle County, Delaware, which have "exclusive jurisdiction."

On February 14, 2024, one day after suing Angstrom in Vandalia Municipal Court, Woodbridge sued Angstrom in the Superior Court of the State of Delaware, alleging that the Lease expired and that Angstrom "continued its manufacturing activities at the [Property] but has ceased paying rent or other obligations" ("Delaware Complaint"). (Doc. 7- 3, ¶ 4.)

The Delaware Complaint concerns the same Property at issue here and claims that upon the expiration of the Lease, and pursuant to the Lease, Asset Purchase Agreement, and Letter Agreement, Angstrom had to either: (1) elect to extend the Lease through May 2032 and indemnify Woodbridge (which Angstrom claims it did elect) or (2) buy the Property. (Doc. 7-3.)

The Delaware Complaint also asserts that Angstrom did not purchase the Property in violation of the Asset Purchase Agreement and Letter Agreement. (*Id*.) Accordingly, the Delaware Complaint asserts claims against Angstrom for breach of the Letter Agreement, seeks specific performance of the Asset Purchase Agreement, a declaratory judgment as to whether Angstrom may execute an extension to the Lease, breach of contract for failing to enter into the Lease extension, specific performance regarding the Lease extension, and indemnification. (*Id*.) The Delaware Complaint also alleges that venue is proper in Delaware Court pursuant to Paragraph 10.6 of the Asset Purchase Agreement because "the [Asset Purchase Agreement] provides that the state and federal courts of Delaware shall have exclusive jurisdiction over any disputes related to or arising out of the Asset Purchase Agreement. Pursuant to the Asset Purchase Agreement, Delaware law controls." (Doc. 7-3, ¶ 13, PageID 128 (citation omitted).)

The Delaware Complaint next asserts that pursuant to that same paragraph of the Asset Purchase Agreement, the Delaware Court "has personal jurisdiction over the parties in that the [Asset Purchase Agreement] provides that all parties to the [Asset Purchase Agreement] 'irrevocably submit[] to the exclusive jurisdiction' of the courts of Delaware and 'waive any objection' that any court in Delaware constitutes an 'inconvenient forum.'" *Id.* at ¶ 14. The Delaware Complaint expressly pleads that the amount in controversy exceeds $1,000,000 and that Woodbridge values the Property at $8.04 million. (*Id.* ¶¶ 12, 46, PageID 128.)

On February 27, 2024, Angstrom filed a Notice of Removal (Doc. 1), removing the Vandalia Municipal Court action to this Court. Angstrom asserted in its Notice of Removal that "this Court has original jurisdiction over the matter pursuant to 28 U.S.C. §§ 1332, 1441 *et seq.*" based on diversity of citizenship and because "the amount in controversy exceeds $75,000.00, exclusive of interests and costs." (Doc. 1, PageID 1.)

On March 14, 2024, Woodbridge filed a stipulation in this Court asserting that it does not seek and will not accept damages in excess of the $75,000.00 jurisdictional threshold in this forcible entry and detainer action. (Doc. 8). That same day, the Delaware complaint was removed to the United States District Court for the District of Delaware. (Doc. 15-2.)

## II.    Motion to Remand

The party seeking removal bears the burden of demonstrating by a preponderance of the evidence that the diversity jurisdiction requirements are more likely met than not. *Hayes v. Equitable Energy Res Co.*, 266 F.3d 560, 572 (6th Cir. 2001). Where the federal court holds doubt as to its jurisdiction, the removal statute should be strictly construed and "'all doubts resolved in

favor of remand.'" *Eastman v. Marine Mech. Corp.*, 438 F.3d 544, 549–50 (6th Cir. 2006) (quoting *Brown v. Francis*, 75 F.3d 860, 864–65 (3d Cir. 1996)).

Because Woodbridge contests the amount in controversy, "both sides submit proof and the court decides, by a preponderance of the evidence, whether the amount-in-controversy requirement has been satisfied." *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 89 (2014) (citation omitted). In so doing, "[t]he Court may rely on reasonable inferences and deductions when determining whether the amount-in-controversy requirement has been met." *James v. Travco Ins. Co.*, 3:23-cv-383, 2024 U.S. Dist. LEXIS 47198, at *5 (S.D. Ohio Mar. 18, 2024) (Gentry, M.J.) (quotations and citation omitted).

The "Sixth Circuit has not specifically addressed how a court should determine the amount in controversy when eviction or detainer actions are removed." *601 W., LLC v. FJ Axe Holdings*, Inc., 1:21-cv-107, 2021 U.S. Dist. LEXIS 262466, at *3 (W.D. Mich. May 18, 2021); *see also Poplar Avalon, LLC v. Sprintcom, Inc.*, 2:16-cv-2393, 2016 U.S. Dist. LEXIS 86497, at *7 (W.D. Tenn. July 5, 2016). "[T]he question poses a 'jurisdictional morass' because 'there is a circuit split as to whether a court may determine the amount in controversy from the perspective of either party (the 'either viewpoint rule') or whether a court may only consider the plaintiff's viewpoint.'" *Everett v. Verizon Wireless, Inc.*, 460 F.3d 818, 829 (6th Cir. 2006) (Sutton, J.) (quoting *Olden v. Lafarge Corp.*, 383 F.3d 495, 503, n.1 (6th Cir. 2004)). "The costs of complying with an injunction … may establish the amount in controversy." *Id.* (citations omitted); *see also Cleveland Hous. Renewal Project v. Deutsche Bank Trust Co.*, 621 F.3d 554, 560 (6th Cir. 2010). "The problem is how to calculate that cost—whether from the perspective of the monetary value of the relief to the

plaintiffs (which will generally be modest) or the monetary value of the relief to the defendant (which may be great in some cases)." *Id.*

Courts within the Sixth Circuit have applied a variety of standards for cases involving nonmonetary relief to eviction matters only seeking possession when addressing whether the jurisdictional minimum is satisfied. See *Poplar Avalon, LLC, Inc.,* 2016 U.S. Dist. LEXIS 86497, at *7. As Judge Caldwell of the Eastern District of Kentucky opined:

> The next issue then is how to determine the monetary value of the right of possession—the object of the litigation in a forcible detainer action. Some courts have indicated that the value of the possession right is equal to the property's rental value. *Aurora Loan Servicing, LLC v. Hampton,* 3:10–cv–2498, 2011 WL 721286, at *2 (N.D. Tex. 2011); *Federal Home Loan Mortg. Corp. v. Khounlo,* 3:11–cv–0118–B, 2011 WL 249494, at *2 (N.D. Tex. 2011). Even among these courts, however, there is disagreement over how to determine the rental value. In *Ezon v. Cornwall Equities, Ltd.,* the court determined that the value of the leasehold interest was equal to at least the annual rental. 540 F. Supp. 885, 889 (S.D. Tex. 1982). While in *Dosdall v. Fraser,* in evaluating a leasehold interest, the court determined that the "the conclusion seems inescapable that the amount i[n] controversy is the rental value for the term of the lease." 246 F. Supp. 311, 314 (D. Mont. 1965); *see also Woodmen of the World Life Insurance Society v. Great Atlantic & Pacific Tea Company, Inc.,* 561 F. Supp. 640, 642 (N.D. Ill. 1982). In *BEM I, LLC v. Anthropologie, Inc.,* the court determined that "the value of possessing a certain piece of leased real estate includes, but is not necessarily limited to, the amount of back rent due at the time of removal." 98–C–358, 1999 WL 1212643, at *3 (N.D. Ill. 1999), *aff'd,* 301 F.3d 548 (7th Cir. 2002).
>
> Back rent is not a valid measure of the amount in controversy here because, unlike the plaintiff in *BEM,* the plaintiff here makes no claim for back rent. Further, there is no basis for evaluating the amount in controversy as the rent due for some arbitrary time period less than the term of the lease. *See BEM,* 1999 WL 1212643, at *5 ("If the term of the lease is ten years, the court is hard-pressed to make sense of a formula that calls for the application of an arbitrary one year cut-off for determining the amount in controversy.")

More importantly, there is no basis for evaluating the amount in controversy as the rent due for the entire lease term. The object of the litigation in a forcible detainer action seeking only possession is not the rent due under the lease. This is clear because, even if YA loses this action and Sunshine is permitted to stay on the premises, YA will be entitled to the rent due under the lease. *See Sterl v. Sears,* 88 F. Supp. 431, 432 (N.D. Tex. 1950) (concluding that the "mere rental value of the land is not at stake" when the plaintiff seeks to evict a tenant because the plaintiff would be entitled to the rent due under the lease even if he lost). If, on the other hand, YA wins this action and Sunshine is required to leave the premises, Sunshine will not have to pay YA the rent due under the lease.

Another way of evaluating the amount in controversy in an action seeking injunctive relief is to total the costs of complying with the injunction. *Everett v. Verizon Wireless, Inc.,* 460 F.3d 818, 829 (6th Cir. 2006). In *Everett,* the court declined to decide whether the costs of complying with the injunction should include only the costs to the plaintiff or also the costs to the defendant. *Id.* Later, however, in *Cleveland Housing,* in evaluating the amount in controversy, the court seems to have considered the costs to the defendant of complying with an injunction. 621 F.3d at 560–61 (considering that the defendant's costs of complying with the requested injunction would have to exceed $3,000 for each of the 25 properties involved).

Unlike the plaintiff in *Cleveland Housing,* however, YA does not seek an injunction that would require Sunshine to undertake significant remedial measures on the properties involved or to demolish them or that would require Sunshine to alter its business practices. *Id.* at 557. YA only asks that the defendant be ordered to leave the premises. Sunshine provides no evidence regarding its costs in leaving the premises.

*YA Landholdings, LLC v. Sunshine Energy, KY I, LLC*, 871 F. Supp. 2d 650, 652–53 (E.D. Ky.

2012).

This Court agrees that it can consider the costs Angstrom would incur if an eviction were

to proceed when considering the amount in controversy question. *Accord Cleveland Housing*, 621

F.3d at 560-61 (considering defendant's costs of complying with injunction in a motion to

remand); *see also Bedell v. H.R.C., Ltd.*, 522 F. Supp. 732, 735 (E.D. Ky. 1981) (stating

defendant's viewpoint in removal cases involving the amount in controversy requirement "is the one that prevails in . . . probably the Sixth Circuit" and applying defendant's view when considering motion to remand).

Here, unlike the defendant in *YA Landholdings*, Defendant does proffer evidence concerning the costs of leaving the premises. Nagesh Palakurthi, Angstrom's Manager, declares the costs associated with an eviction order would surpass $75,000. (Doc. 13-5, PageID 354, ¶ 1-3.) He avers that moving Angstrom's furniture to be worth $110,000; (*Id.*, PageID 366, ¶ 11) Angstrom's equipment to be worth $5 to 10 million, ¶ 13, and that it would cost "in the millions to move." (*Id.*, ¶ 12.) This is apparently because, "new site requirements must include cranes, clear height and heavy-manufacturing ready floors; and [would take] 3 to 6 months of site identification and [an additional] 3 to 6 months of design, permits and construction expense to complete 6 to 15 ft deep concrete foundations or slabs as required to install press Equipment." (*Id.*)

Palakurthi additionally states that if an eviction is ordered Angstrom could not perform its contracts with car manufacturers and would lose millions in revenue and profits and be subject to liability under those contracts. (Doc. 13-5, PageID 367, ¶ 16.) Moreover, as many as 187 Dayton-area residents would lose their jobs, (*Id.*, ¶ 14.) Realtor Tim Echemann declares it would cost Angstrom about $13.25 million to build a similar property in a similar area and $5 million to retrofit an existing site. (Doc. 13-6, PageID 920 ¶¶ 11- 12). Palakurthi's and Echemann's declarations establish by a preponderance of the evidence that Angstrom's cost of compliance with an eviction order would exceed $75,000.

Alternatively, because a forcible detainer case is valued the same as "other actions seeking no monetary damages and seeking only injunctive or declaratory relief.… '[I]t is well established

that the amount in controversy is measured by the value of the object of the litigation.'" *YA Landholdings, LLC*, 871 F. Supp. 2d at 652 (quoting *Hunt v. Washington State Apple Advertising Comm.*, 432 U.S. 333, 347 (1977)). In eviction matters, the object of the litigation is the right of occupancy or possession of the property. *YA Landholdings, LLC*, 871 F. Supp. 2d at 652. In removed eviction cases like this that seek nonmonetary relief and face a motion to remand, courts within the Sixth Circuit have employed two approaches in addition to defendant's cost of compliance when determining whether the right of occupancy or possession satisfies the amount in controversy requirement. *See Cleveland Housing Renewal Project*, 621 F.3d at 560-61 (applying Defendant's cost of compliance); *see also Bedell*, 522 F. Supp. at 735 (same). Those include: (1) the difference in plaintiff's position before the lawsuit and if the lawsuit is successful; and (2) the fair market value of the Property that is the subject of the eviction action. *See 601 W., LLC* , 2021 U.S. Dist. LEXIS 262466, at *4 (plaintiff's economic position); *see also Wells Fargo Home Mortg. v. Bullock*, 2:13-cv-2933, 2014 U.S. Dist. LEXIS 135798, at *7-8 (W.D. Tenn. Sep. 26, 2014) (fair market value). Angstrom establishes by a preponderance of the evidence that more than $75,000 is at issue under either of those methods.

Some courts compare the plaintiff's position with the eviction against the plaintiff's position without the eviction. *A. Levet Props. P'ship v. Bank One, N.A.*, Nos. 03-1708, 03-1373, 2003 U.S. Dist. LEXIS 12777, at *8-9 (E.D. La. July 21, 2003) (eviction action for commercial property seeking no monetary relief). Here, if the eviction does not occur, the Lease and Letter Agreement direct that Woodbridge would be entitled to the outstanding rent due. Woodbridge claims that amount is $120,000. (Doc. 1-2, ¶ 9, PageID 11.) But

> if [Angstrom] w[as] unable to pay rent under the [Sub-Sub]lease,
> then possession would give [Woodbridge] the ability to re-lease the

premises to another tenant, and the value of possession would be the rent [Woodbridge] could collect from a new tenant.

*A. Levet Props. P'ship*, 2003 U.S. Dist. LEXIS 12777, *8-9. Under that framework, if an eviction occurs, Woodbridge could sublease the Property and collect monthly rent at least equal to the $60,000 a month that Angstrom paid. *Id*. ( "if [defendant] were unable to pay rent under the lease, then possession would give [plaintiff] the ability to re-lease the premises to another tenant, and the value of possession would be the rent [plaintiff] could collect from a new tenant.")

The Lease was executed in June 2023 for a monthly rent of $60,000; Angstrom asserts that the Dayton industrial real estate market has not gotten exceedingly worse and not much time has passed, making it is fair to infer that Woodbridge could still obtain $60,000 a month for the Property today. See *James*, 2024 U.S. Dist. LEXIS 47198, at *5. Thus, under the Lease's either six or 106 month term, Woodbridge could collect $360,000 or $636,000 if an eviction occurred. That is at least a $240,000 gain. ($360,000-$120,000).

That base would grow pursuant to the Lease. Paragraph 14(A) states that Angstrom "shall be fully liable for all losses, costs, expenses, claims, and damages, including but not limited to reasonable attorney's fees' directly caused by" Angstrom's breach. (Doc. 7-2, PageID 158.) Paragraph 14(C) states that no termination of the Lease "shall release [Angstrom] from its covenants to pay the rent and other charges provided for in this [L]ease." *Id*.

Paragraph 16 of the Lease requires Angstrom to pay Woodbridge's attorney's fees if the eviction takes place. (*Id*. at PageID 159.) As the Declaration of Nagesh Palakurthi shows, Angstrom has already spent more than $75,000 on attorney's fees. (Doc. 13-5, PageID 366.) *See James*, 2024 U.S. Dist. LEXIS 47198, at *5. Under the Lease, Angstrom could have to pay Woodbridge's attorney's fees and costs. (Doc. 7-2, PageID 159.) Hence, when Woodbridge's

costs, expenses, and attorney's fees are added to the $240,000, Woodbridge's economic position would improve by more than $75,000 in the event of an eviction. Angstrom sustains the amount in controversy requirement under the noted method. Thus, under this approach too, the Motion to Remand will be denied.

Woodbridge's Stipulation states Woodbridge "will not accept any monetary relief" in this case so the amount in controversy is less than $75,000. (Doc. 8, PageID 146.) However, because jurisdiction is determined at the time an action is removed, Woodbridge cannot seek relief valued at more than $75,000 and then state it seeks no relief at all. "'[W]hether a federal court has jurisdiction is determined at the time of removal.'" *Total Quality Logistics, LLC v. All. Shippers, Inc.*, 1:19-cv-1052, 2020 U.S. Dist. LEXIS 104360, at *4 (S.D. Ohio June 15, 2020) (quoting *Williamson v. Aetna Life Ins. Co*., 481 F.3d 369, 375 (6th Cir. 2007)). As such, "'a post-removal stipulation reducing the amount in controversy to below the jurisdictional limit does not require remand to state court.'" *Id*. (quoting *Heyman*, 781 F. App'x at 469 (quoting *Rogers v. Wal-Mart Stores, Inc.*, 230 F.3d 868, 872 (6th Cir. 2000)). The Stipulation therefore fails to warrant remand.

## III.    Motion to Transfer Venue

Angstrom seeks transfer to the United States District Court for the District of Delaware, asserting that the Delaware forum is predicated upon a valid, enforceable forum selection clause in the agreement between the parties, pursuant to 28 U.S.C. § 1404(a). A primary question is whether the forum selection clause at issue is permissive or mandatory.

Pursuant to 28 U.S.C. § 1404(a) ("Section 1404"), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action … to any district or division to which all parties have consented."

As previously discussed, the Lease, the Asset Purchase Agreement and the Letter Agreement form one contract. While the Lease lacks a forum selection clause, the Asset Purchase Agreement does not. Paragraph 10.6 of the Asset Purchase Agreement states where an action "may" be brought and continues to state that courts in New Castle County, Delaware, have "exclusive" jurisdiction. (Doc. 7-1, PageID 74, at ¶ 10.6). The Asset Purchase Agreement defines "Transaction Documents" to include the Lease and the Letter Agreement. (Doc. 7-1, PageID 81.) Hence, the Asset Purchase Agreement plainly dictates that the parties: (1) "IRREVOCABLY" submit to the "EXCLUSIVE JURISDICTION" in the state or federal courts of Delaware for all legal actions predicated on the Lease; (2) "IRREVOCABLY AND UNCONDITIONALLY WAIVE" any objection as to venue in those courts; and (3) IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM" forum *non conveniens*. (Doc. 7-1 at ¶ 10.6, PageID 74) (allcaps in original)

Given the agreement underlying the instant dispute contains a forum selectin clause, the Sixth Circuit dictates that this Court "must first—before balancing the *forum-non-conveniens* factors—determine whether a forum-selection clause is applicable to the claims at issue, mandatory, valid, and enforceable." *Lakeside Surfaces, Inc.*, 16 F.4th at 215. If those factors are shown, this Court then examines whether Woodbridge has sustained its burden of establishing "that public-interest factors overwhelmingly disfavor a transfer." *Atlantic Marine*, 571 U.S. at 66. Thus, if there is an applicable forum selection clause, the Court must ask whether Plaintiff can defeat a strong presumption in favor of enforceability by showing that (1) the clause was obtained by fraud, duress, or other unconscionable means; (2) the designated forum would ineffectively or unfairly handle the suit; (3) the designated forum would be so seriously inconvenient that requiring

the plaintiff to bring suit there would be unjust; or (4) enforcing the forum selection clause would contravene a strong public policy of the forum state. *Lakeside Surfaces*, 16 F.4th at 219–20.

## A.    Applicability of the Forum Selection Clause

"A forum selection clause is mandatory if it clearly indicates that jurisdiction is proper only in the selected forum." *Kinzie Advanced Polymers LLC v. Highopes, LLC*, 1:23-cv-1524, 2024 U.S. Dist. LEXIS 49994, at *4 (N.D. Ohio Mar. 12, 2024) (citation and quotation omitted). "A mandatory forum selection clause grants exclusive jurisdiction to a selected forum, while a permissive forum selection clause only reflects the contracting parties' consent to resolve disputes in a certain forum, but does not require that disputes be resolved in that forum." *Macsteel Intl USA Corp. v. M/V Larch Arrow*, 354 F. App'x 537, 539 (2d Cir. 2009); s*ee also*, *Am. Soda, LLP v. U.S. Filter Wastewater Grp., Inc.*, 428 F.3d 921, 926–27 (10th Cir. 2005) (citation omitted) ("The difference between a mandatory and permissive forum selection clause is that '[m]andatory forum selection clauses contain clear language showing that jurisdiction is appropriate only in the designated forum, [while] permissive forum selection clauses authorize jurisdiction in a designated forum, but do not prohibit litigation elsewhere.'"); *North California Dist. Council of Laborers v. Pittsburgh-Des Moines Steel Co.*, 69 F.3d 1034, 1037 (9th Cir. 1995) ("To be mandatory, a clause must contain language that clearly designates a forum as the exclusive one."); *see also Scepter, Inc. v. Nolan Transportation Grp., LLC,* 352 F. Supp. 3d 825, 830–31 (M.D. Tenn. 2018) (gathering cases).

The parties in the instant case agreed in the Forum Selection Clause that for "ANY LEGAL SUIT, ACTION OR PROCEEDING" arising out of the Lease that they "IRREVOCABLY SUBMIT[] TO THE EXCLUSIVE JURISDICTION" of the Delaware State or Federal Courts and

that they "IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM." (Doc. 7-1 at ¶ 10.6, PageID 74) (allcaps in original). "The word 'any' is all-encompassing language, indicating the parties' belief that all actions regarding their relationship will be governed by the forum selection clause." *Travelers Prop. Cas. Co. of Am. v. Centimark Corp.*, 2:04-cv-916, 2005 U.S. Dist. LEXIS 35611, at *7 (S.D. Ohio May 3, 2005). Thus, because the instant dispute seeks possession of the Property pursuant to the Lease, this case arises out of the Lease and Transaction Documents and must be transferred to the Delaware Federal Court. *Race Winning Brands, Inc. v. Crawford*, 601 F. Supp. 3d 279, 286 (N.D. Ohio 2022) (holding that "the forum-selection clause [was] mandatory by its plain language" because it required the parties to "irrevocably submit to the exclusive jurisdiction of courts located in Delaware.")

The Court notes that Woodbridge initiated an action in federal court in Delaware that seeks an order requiring Angstrom to retain the Property and avers that venue is proper there pursuant to Paragraph 10.6 of the Asset Purchase Agreement because "the [Asset Purchase Agreement] provides that the state and federal courts of Delaware shall have exclusive jurisdiction over any disputes related to or arising out of the Asset Purchase Agreement." (Doc. 7-3, ¶ 13, PageID 128.) Accordingly, there is an applicable forum selection clause.

**B.     Whether the Clause was Obtained by Fraud, Duress or Unconscionable Means**

Turning to fraud, duress, or unconscionably, Woodbridge "must show fraud in the inclusion of the [Forum Selection Clause] itself; general claims of fraud are not sufficient to invalidate a forum-selection clause." *Superior Care Pharmacy, Inc. v. Med. Shoppe Int'l, Inc.*, 2:10-cv-207, 2011 U.S. Dist. LEXIS 13013, at *9 (S.D. Ohio Feb. 10, 2011) (citation omitted). Woodbridge asserts in the   Federal Delaware Case that "the [Asset Purchase Agreement] provides that the state and federal courts of Delaware shall have exclusive jurisdiction over any disputes related to or arising out of the Asset Purchase Agreement." (Doc. 7-3, ¶ 13, PageID 128.)

Woodbridge "must show" that "that court would ineffectively or unfairly handle the suit." *Wong*, 589 F.3d at 829. "Different or less favorable foreign law or procedure alone does not satisfy this prong. Rather, the foreign law must be such that a risk exists that the litigants will be denied any remedy or will be treated unfairly." *Id.* (internal citation omitted).

Plaintiffs assert that Delaware is an unfair forum because they do not believe the forcible entry and detainer action can be maintained in Delaware. As a result, Plaintiffs contend, transferring the forcible entry and detainer action would "depriv[e Woodbridge] of its day in court." (Doc. 17, PageID 1163.) Plaintiffs assert the forcible entry and detainer action is a statutory action under Ohio law solely to obtain possession of the Premises. (*Id.* (citing *State ex rel. Carpenter v. Warren Mun. Ct.*, 400 N.E.2d 391, 393 (Ohio 1980) ("forcible entry and detainer action relates only to present possession and not title…").)

"In Ohio, Revised Code Chapter 1923 governs forcible entry and detainer actions. Ohio Revised Code § 1923.01(A) vests authority for these proceedings in 'any judge of a county or municipal court or a court of common pleas, within the judge's proper area of jurisdiction.' In addition, a municipal court has original jurisdiction over any action of forcible entry and detainer

17

within its territory.... Because the subject of a forcible entry and detainer proceeding is real property, venue is necessarily "fixed in the county in which the property, or any part thereof, is situated." *Middletown Park Realty, LLC v. Bar BQ Junction, Inc.*, 2010-Ohio-2171, ¶ 16, 2010 Ohio App. LEXIS 1784, 2010 WL 1960142, at *2 (Ohio App. May 17, 2010). According to Plaintiff, in order for a landlord to obtain possession of property located in Ohio, the state of Ohio requires the landlord to file a complaint for forcible entry and detainer action in Ohio. *Id.*, at *3. Any court outside of the county (or state) where the Premises are located is simply "unable to enforce" the forcible entry and detainer action. *Id.*, at *2.

This might be true if the Ohio case was only about title to the property, but the contours of the local action doctrine suggest a different result:

> Firmly established under English common law, the local action doctrine was then "imported" into the jurisprudence of this country in 1811. *Prawoto v. PrimeLending*, 720 F. Supp. 2d 1149, 1152 (C.D. Cal. 2010). As Chief Justice John Marshall stated, actions "are deemed transitory, where transactions on which they are founded, might have taken place anywhere; but are local where their cause is in its nature necessarily local." *Livingston v. Jefferson*, 15 F. Cas. 660, 664 (C.C.D. Va. 1811) (No. 8,411). From this point forward, courts in the United States have referred to the local action doctrine as jurisdictional. *See Casey v. Adams*, 102 U.S. 66, 26 L. Ed. 52 (1880); *Ellenwood v. Marietta Chair Co.*, 158 U.S. 105, 15 S. Ct. 771, 39 L. Ed. 913 (1895); *Fall v. Eastin*, 215 U.S. 1, 30 S. Ct. 3, 54 L. Ed. 65 (1909).
>
> However, even against this jurisdictional backdrop, courts have routinely decided actions involving real property can be transitory. *See Dull v. Blackman*, 169 U.S. 243, 246–47, 18 S. Ct. 333, 42 L. Ed. 733 (1898) (explaining a dispute that did "not operate directly upon the lands" can be brought in a different state).

*Tap Rock Res., LLC v. Marathon Oil Permian LLC*, 704 F. Supp. 3d 1194, 1199 (D.N.M. 2023).

At first blush, the doctrine would seem to warrant remand to state court:

18

> the local action doctrine concerns the distinction between local and transitory actions that existed in common law. *See* 15 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3822 (2d ed. 1986). If the dispute directly involves real property, then the local action doctrine applies; but subject matter jurisdiction may exist outside the territorial boundaries of the state in which the land is located if the claim is merely a transitory action. *See L'Invincible*, 14 U.S. (1 Wheat.) 238, 242, 4 L. Ed. 80 (1816) ("An injury of this nature is either to be redressed by a process *in rem* or *in personam*, and in either case, application must be made where the thing, or person, is found."); *Ellenwood*, 158 U.S. at 107, 15 S. Ct. 771.

*Tap Rock Res.*, 704 F. Supp. 3d at 1201.

> An action *in rem* that claimed an interest in immovable property was usually treated as a local action that could be brought only in the jurisdiction where the property was located .... Meanwhile, an *in personam* suit against an individual for injuries that might have happened anywhere was generally considered a transitory action that followed the individual. All of which meant that a suit could be maintained by anyone on any claim in any place the defendant could be found.

*Id.,* (quoting *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 143 S. Ct. 2028, 2034, 216 L. Ed.2d 815 (2023) (cleaned up)).

In the end, the fact that Plaintiff has requested equitable relief is determinative:

> An *in personam* action adjudicates the "rights and obligations of individual persons or entities." *Pennoyer v. Neff*, 95 U.S. 714, 727, 24 L. Ed. 565 (1877). Essentially, actions are transitory when the underlying allegations could have occurred anywhere. *Livingston*, 15 F. Cas. at 664 ("It is admitted, that on a contract respecting lands, an action is sustainable wherever the defendant may be found."). On the contrary, actions involving "a naked question of title" as to land are local. *Massie v. Watts*, 10 U.S. 148, 158, 3 L. Ed. 181 (1810).

*Id.*

Because equitable remedies ask someone to do something, *e.g.* relinquish possession, they

are *in personam* actions:

> The "lack of a particular remedy or cause of action in the alternative
> forum" does not render that venue inadequate. *Yavuz v. 61 MM, Ltd.*,
> 576 F.3d 1166, 1175–77 (10th Cir. 2009). Like the Plaintiff in
> *Yavuz*, the Plaintiffs here conflate their possible remedies with the
> nature of their lawsuit. A court, acting pursuant to *in personam*
> jurisdiction of a transitory action can order a remedy that affects real
> property. In fact, "equity acts *in personam.*" *Wilhelm v. Consol. Oil
> Corp.*, 84 F.2d 739, 746 (10th Cir. 1936) (citing *Hart v. Sansom*,
> 110 U.S. 151, 154, 3 S. Ct. 586, 28 L. Ed. 101 (1884)).

*Id.*, at 1202. "[P]ossession of a premises is equitable in nature." *City of Webster Groves, MO v.

CCATT LLC*, 4:18-cv-1910, 2019 WL 4169848, at *4 (E.D. Mo. Sept. 3, 2019). Plaintiff has not

raised an abstention argument, and, given the concurrent litigation in Delaware concerning other

aspects of the business relationship, the Court does not perceive that an abstention argument would

prevail.

## C.    Whether Delaware Can Handle the Dispute

Woodbridge also decries that Delaware would be an inconvenient forum, as it does not

believe a Court in Delaware can resolve possession. This is not so:

> In a diversity action, the district court sits as a state court. *Zucker v.
> Vogt,* 200 F. Supp. 340, 341 (D. Conn.1961). The district court is
> obliged to exercise the jurisdiction it is given. *Colorado River Water
> Conservation Dist. v. United States,* 424 U.S. 800, 817, 96 S. Ct.
> 1236, 1246, 47 L.Ed.2d 483 (1976). The scope of that jurisdiction is
> governed by federal law. *Franklin Life Ins. Co. v. Falkingham,* 229
> F.2d 300, 302 (7th Cir. 1956). State law or rules of practice or
> procedure can neither enlarge nor diminish federal court
> jurisdiction. *Lowry & Co. v. National City Bank of New York,* 28
> F.2d 895, 896 (2d Cir.1928).
>
> Defendant's suggestion that a summary forcible entry and detainer
> proceeding does not constitute a civil action within the meaning of
> 28 U.S.C. § 1332 is unfounded. In § 1332 "civil action" is used in

contradistinction to actions which are criminal. *See Milwaukee County v. White Co.,* 296 U.S. 268, 270, 56 S. Ct. 229, 230, 80 L. Ed. 220 (1935). Civil actions are those which do not involve criminal prosecution or punishment and are of a character traditionally recognized by courts of common law or equity. *Id.* at 271, 56 S. Ct. 231. A forcible detainer action is civil in nature in that the action is one for damages. *See, e.g., Brewer v. Fathergill,* 30 Conn. Supp. 607, 318 A.2d 131 (1973) (entry and detainer statute allows jurisdiction of a civil action for treble damages); **\*737** *see also Famous Realty, Inc. v. Flota Mercante Grancolombiana,* 81 F. Supp. 553 (E.D.N.Y.1948) (court rejected argument that a summary proceeding to recover possession of premises was not a civil action within the meaning of 28 U.S.C. § 1441(a)).

Defendant's arguments in support of its Rule 12(b)(1) motion would lead to the inevitable conclusion that the State of Connecticut has, to the extent of the subject matter and procedure to which Conn. Gen. Stat. § 47a–43 pertains, preempted the United States Constitution, Art. III, § 2, cl. 1, as well as 28 U.S.C. § 1332. The Constitution states that "the judicial Power shall extend ... to Controversies ... between Citizens of different States." Absent constitutional amendment, Congress alone has the power to alter the jurisdiction of the federal judiciary. Section 1332 provides that the district courts will have original jurisdiction over all civil actions between citizens of different states where the matter in controversy exceeds $10,000. The state simply cannot carve out of that grant of jurisdiction a preemption for § 47a–43 matters. *Kline v. Burke Constr. Co.,* 260 U.S. 226, 43 S. Ct. 79, 67 L. Ed. 226 (1922); *Gains v. Fuentes,* 92 U.S. (2 Otto) 10, 23 L. Ed. 524 (1875).

Accordingly, defendant's jurisdictional challenge must necessarily fail.

*Balf Co. v. Exxon Corp*., 682 F. Supp. 735, 736-37 (D. Conn. 1988). The same result holds here.

## D.    Serious Inconvenience

The final prong concerns whether the Delaware Federal Court would be so "seriously inconvenient such that requiring [Woodbridge] to bring suit there would be unjust." *Wong*, 589 F.3d at 828. "A finding of unreasonableness or injustice must, however, be based on more than inconvenience to the party seeking to avoid the forum-selection clause's requirements." *Info.*

*Leasing Corp. v. Jaskot*, 784 N.E.2d 1192, 1196 (Ohio 2003). "Under this step of the analysis, courts are to determine whether the chosen forum is so inconvenient as to, in effect, afford no remedy at all, thus depriving litigants of their day in court." *Preferred Capital, Inc. v. Assocs. in Urology*, 453 F.3d 718, 722-723 (6th Cir. 2006) (citation and quotation omitted).

The public interest factors include: "(1) the court's interest in judicial economy; (2) docket congestion; (3) local interest in deciding the controversy at home[;] and (4) in diversity cases, the interest of conducting the trial in the forum of governing law." *Olin-Marquez v. Arrow Senior Living Mgmt., LLC*, 586 F. Supp. 3d 759, 778 (S.D. Ohio 2022) (citation omitted). Here, each factor supports transfer.

Judicial economy favors transfer. Both this matter and the Delaware action focus on the right to possess the property based on the Asset Purchase Agreement, Lease, and the Letter Agreement. Placing all claims pertaining to the property and all applicable agreements before the Delaware court improves judicial economy. Furthermore, transfer avoids piecemeal litigation. "Most critical here is the interest in avoiding piecemeal litigation—the Court can see no advantage…in the prosecution of two closely related parallel proceedings in two different courthouses." *Krawec v. Allegany Co.-op Ins. Co.*, 1:08-cv-2124, 2009 U.S. Dist. LEXIS 57792, at *23 (N.D. Ohio July 7, 2009) (citation omitted); *see also Pratt Corrugated Holdings, Inc. v. Porter Pizza Box of Ohio, LLC*, 2:23-cv-448, 2023 U.S. Dist. LEXIS 141166, at *15 (S.D. Ohio Aug. 11, 2023). The risk of inconsistent judgments is significant here because Woodbridge seeks an order from this Court evicting Angstrom from the Property while simultaneously asking the Delaware court to order specific performance such that Angstrom would purchase the Property. (Doc. 15-3, PageID 994.) "[S]imultaneous adjudication of [this case and the Delaware Federal

Action] could yield conflicting interpretations of the parties' contractual obligations." *Free State of Bavaria v. Ohio State Univ.*, 2:22-cv-2580, 2023 U.S. Dist. LEXIS 71990, at *10 (S.D. Ohio Apr. 24, 2023). Hence, judicial economy weighs in favor of transfer.

Docket congestion weighs similarly. The United States District Court for the District of Delaware 419 actions pending per judgeship as of June 30, 2024. *See* https://www.uscourts.gov/statistics/table/na/federal-court-management-statistics/2024/06/30-1 (visited Sept. 9, 2024). In contrast, the Southern District has 943 pending cases per judgeship as of that same date. *Id.* Thus, the United States District Court for the District of Delaware is less congested and transfer there is appropriate.

For the local interest consideration, Angstrom acknowledges the property is located in the Southern District of Ohio. Yet, "given [Angstrom's] litigation strategy of filing multiple nearly identical suits across the country, the Court finds that the issues of this case are not those of a single, local controversy." *Pratt Corrugated Holdings, Inc. v. Porter Pizza Box of Ohio, LLC*, 2:23-cv-448, 2023 U.S. Dist. LEXIS 141166, at *14 (S.D. Ohio Aug. 11, 2023). Additionally, Woodbridge agreed in the Asset Purchase Agreement, Lease, and Letter Agreement to the exclusive jurisdiction of the Delaware courts. Consequently, the last two factors support transfer.

In sum, all public-interest factors favor transfer. Woodbridge cannot establish that this is the rare case preventing transfer. The Motion to Transfer Venue will be granted.

## V.    Conclusion

Because the parties are diverse and the minimum amount in controversy for diversity jurisdiction is met, Woodbridge's Motion to Remand (Doc. 9) is **DENIED**; because the factors governing motions to transfer favor transfer, Angstrom's Motion to Transfer (Doc. 15) is

**GRANTED**. The Clerk is instructed to transfer the instant case to the United States District Court for the District of Delaware. The instant case is **TERMINATED** on the dockets of the United States District Court for the Southern District of Ohio, Western Division at Dayton.

　　　　**DONE** and **ORDERED** in Dayton, Ohio, this Monday, September 16, 2024.

s/Thomas M. Rose

_____

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE
